ORIGINAL

16 MAG 2011

APPROVED: _____
CHRISTINE I. MAGDO
Assistant United States Attorney

U.S. DISTRICT COURT
FILED
MAR 25 2016
S.D. OF N.Y.

BEFORE:   _____
THE HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

DOC #___ ___

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :     SEALED COMPLAINT

        - v. -                  :     Violations of:
                                      15 U.S.C. §§ 78j(b) & 78ff;
ANDREW CASPERSEN,               :     17 C.F.R. § 240.10b-5;
                                      18 U.S.C. §§ 1343 & 2.
            Defendant.          :
                                      COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - - x     NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        KURT HAFER, being duly sworn, deposes and says that he
is a Criminal Investigator with the United States Attorney's
Office, Southern District of New York ("USAO SDNY"), and charges
as follows:

## COUNT ONE
### (Securities Fraud)

        1.    From at least in or about July 2015 up through
and including in or about March 2016, in the Southern District
of New York and elsewhere, ANDREW CASPERSEN, the defendant,
willfully and knowingly, directly and indirectly, by the use of
the means and instrumentalities of interstate commerce, and of
the mails, and of the facilities of national securities
exchanges, did use and employ, in connection with the purchase
and sale of securities, manipulative and deceptive devices and
contrivances in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts necessary

in order to make the statements made, not misleading; and (c)
engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons,
to wit, CASPERSEN solicited investments in securities by falsely
representing that he had authority to conduct deals on behalf of
his employer with other private equity funds, and that
investors' funds would be invested in a secured loan to an
investment firm, when in fact no such security existed and no
investments were made, and which funds CASPERSEN converted to
his own use, and the use of others, without the authorization of
his investors.

   (Title 15, United States Code, Sections 78j(b) and 78ff; Title
   17, Code of Federal Regulations, Section 240.10b-5; and Title
                18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

      2.   From at least in or about July 2015 up through
and including in or about March 2016, in the Southern District
of New York and elsewhere, ANDREW CASPERSEN, the defendant,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire communication in interstate and
foreign commerce, writings, signs, signals and sounds for the
purpose of executing such scheme and artifice to defraud, to
wit, CASPERSEN solicited investments in securities, including
through the use of the telephone and email, by falsely
representing that he had authority to conduct deals on behalf of
his employer with other private equity funds, and that
investors' funds would be invested in a secured loan to an
investment firm, when in fact no such security existed and no
investments were made, and which funds CASPERSEN converted to
his own use, and the use of others, through the use of wire
transfers, without the authorization of his investors.

      (Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

3.   I am a Criminal Investigator with the USAO SDNY and I participated in the investigation of this matter.  I have been a Criminal Investigator with the USAO SDNY since February 2016.  Prior to February 2016, I was employed as a Criminal Investigator at the United States Department of Energy's Office of Inspector General for approximately six and a half years. Since 2010, my responsibilities have included the investigation of securities fraud, mail and wire fraud, and other white-collar offenses.

4.   I base this affidavit on that experience, my conversations with a victim investor, and my review of numerous documents, including bank records, emails, publically available information, and a consensually recorded telephone conversation. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Relevant Individuals and Entities

5.   From in or about 2003 through in or about 2012, ANDREW CASPERSEN, the defendant, was employed as an investment principal in the New York office of a multi-national firm that invested in the private equity secondary market by acquiring portfolios of private equity interests from their original investors ("Firm-1").

6.   From in or about January 2013 through the present, ANDREW CASPERSEN, the defendant, was a partner in the secondary advisory group in the New York office of a multi-national private equity, investment banking, alternative asset management and financial services corporation ("Firm-2"). During his time at Firm-2, CASPSERSEN provided services to private equity fund investors and managers seeking portfolio

liquidity, unfunded commitment relief and investments in the secondary market.

7.    At all times relevant to this Complaint, individuals not named herein ("Individual-1" and "Individual-2") were employed at a multi-national hedge fund, headquartered in New York ("Firm-3").  In connection with his employment at Firm-3, Individual-1 evaluated and recommended investments for a charitable foundation (the "Foundation") affiliated with Firm-3.

8.    At all times relevant to this Complaint, a firm not named herein was a private equity firm, located in New York, New York ("Firm-4").

9.    At all times relevant to this Complaint, a firm not named herein was a multi-national private equity firm, headquartered in New York, New York ("Firm-5").

## CASPERSEN's Scheme to Defraud Firm-3

10.    Based on my review of, among other things, email communications between ANDREW CASPERSEN, the defendant, and others, and my conversations with Individual-1 and Individual-2, I have learned the following:

a.    On or about October 24, 2015, CASPERSEN sent an email to Individual-1, in which CASPERSEN described "a new investment" that he had structured and in which he was personally investing.  CASPERSEN described the investment as a "security" consisting of an $80 million credit facility secured by a private equity portfolio.  CASPERSEN further represented that the investor would receive quarterly interest payments and could redeem the security at any time with 90 days' notice.

b.    On or about October 26, 2015, CASPERSEN and Individual-1 corresponded by telephone and email, and CASPERSEN made the following representations in connection with the supposed investment opportunity he had referenced two days earlier: (i) Firm-4 wanted to offer liquidity to investors (the "Original Investors") who had invested in a Firm-4 fund (the "Fund") in or about 2006; (ii) CASPERSEN, acting in his capacity

as a partner at Firm-2, put Firm-4 in touch with Firm-1; (iii)
Firm-1 agreed to "buy out" any of the Original Investors who
wished to sell their positions in the Fund; (iv) Firm-4 was
concerned that Firm-1 did not have enough money to purchase the
positions of all the Original Investors who may want to
liquidate their positions in the Fund; (v) Firm-2 agreed to make
an $80 million loan to Firm-1 (the "Loan"), in order to ensure
that Firm-1 had enough money to buy out all of the Original
Investors; (vi) Firm-1 created a special purpose vehicle (the
"SPV") for the purpose of purchasing the positions of the
Original Investors; (vii) CASPERSEN and Firm-2 were working on
behalf of Firm-1 to solicit investors in the Loan; (viii)
CASPERSEN had already raised $30 million from his family office
and two other family offices toward the Loan;[1] (ix) at some point
after Firm-1 agreed to the Loan, it transpired that Firm-1 did
not need the Loan in order to purchase the positions of the
Original Investors; (x) however, because Firm-1 had already
agreed to the Loan, Firm-1 was obligated to pay interest on the
Loan, at an annual rate of 15%; (xi) because Firm-1 no longer
needed the $80 million to buy out the Fund's Original Investors,
according to CASPERSEN, "the plan" was "to keep the entire $80m
at the SPV." In short, CASPERSEN was offering Individual-1 and
the Foundation the right to invest in the purported Loan and
receive interest payments until a point at which the principal
of the investment would be returned to the Foundation.
CASPERSEN sent Individual-1 the 2014 annual report for the Fund.

        c.    On or about November 2, 2015, CASPERSEN sent
Individual-1 an email which attached the wire transfer
instructions for investment in the SPV. The instructions gave a
bank account in the name of the SPV ("Account-1"). On or about
November 3, 2015, CASPERSEN sent an email to Individual-1 and
Individual-2, to which he attached a security agreement (the
"November Security Agreement") and a promissory note ("the
November Note"), both of which were purportedly signed on behalf
of the SPV by "[Individual-3]" as the "Authorized Signatory" for
the SPV. The November Note stated, in part, that: (i) the SPV
would pay the Foundation the principal sum of $25 million "in

---

[1] A "family office" is a private wealth management advisory firm
that serves high net worth investors.

immediately available funds" together with interest on the
unpaid principal; (ii) interest on the outstanding unpaid
balance shall accrue at an annual rate of 15%; (iii) interest
shall be paid quarterly; (iv) upon 90 days' notice to the SPV,
the Foundation may redeem the principal sum of $25 million; (v)
the SPV "shall maintain cash or cash equivalents in an amount
equal to or greater than" the total of the outstanding principal
and accrued but unpaid interest.  The November Security
Agreement claimed that the collateral for the loan was Firm-1's
ownership interest in the assets of the Fund, which was valued
at approximately $900 million.

   d. On or about November 4, 2015, CASPERSEN sent
Individual-1 an email which attached a letter from the SPV,
purportedly signed in the name of Individual-3, which requested
that the Foundation, for which Individual-1 evaluated and
recommended investments, send $25 million to Account-1 pursuant
to the November Note.

   e. On or about March 1, 2016, after the
Foundation had made a $24.6 million investment and Individual-1
had made a personal $400,000 investment in the SPV, CASPERSEN
sent Individual-1 emails representing that "the other large
investor" in the SPV, which he described as "a family office
founded with oil/gas money," had contacted CASPERSEN to redeem
its $25 million investment.  CASPERSEN further represented that
he had convinced Firm-1 to re-issue the other investor's
promissory note to new investors.  CASPERSEN claimed that
CASPERSEN's family would make a $5 million investment, and asked
Individual-1 if the Foundation wanted to invest additional funds
in the remaining $20 million portion of the promissory note.

   f. On or about March 2, 2016, CASPERSEN sent
Individual-1 an email attaching a letter from the SPV,
purportedly signed by Individual-3, purporting to confirm that
the SPV had assets worth approximately $980 million, including
$113,542,081 in cash (the "Promissory Note Compliance Letter").
CASPERSEN also sent Individual-1 an email attaching a draft
promissory note ("the March 2 Note") for the Foundation's
anticipated new $20 million investment.  The March 2 Note
contained substantially the same terms as the November Note, as

well as a signature line for Individual-3, purportedly on behalf
of the SPV.  In response to Individual-1's questions about
Individual-3, CASPERSEN sent Individual-1 an email stating that
Individual-3 worked at Firm-1.

        g.   On or about March 7, 2016, Individual-1 told
CASPERSEN that Individual-1 wished to speak with Individual-3.
In response, CASPERSEN sent an email to Individual-1 and to an
email address containing both the name of Individual-3 and the
name of Firm-1 (the "Email Address"), to set up a conference
call for later that day.  CASPERSEN represented to Individual-1
that CASPERSEN's family had wired its $5 million investment
earlier that day.

        h.   Later that day, a representative of Firm-3
(Individual-1's employer) informed Individual-1 that the domain
name of the Email Address had been registered that same morning,
approximately 20 minutes after Individual-1 requested a
telephone call with Individual-3, and that the domain name was
not the same as Firm-1's actual domain name.  Individual-1 also
was told that a representative of Firm-3 had called Firm-1's New
York office and was told that no one named Individual-3 worked
at Firm-1.

        i.   Later that day, at or about 2:00 pm,
Individual-1 called in to a conference calling line provided by
CASPERSEN and spoke to an individual who claimed to be
Individual-3.  Individual-3 claimed to be a vice president in
the New York office of Firm-1.  During the conference call,
Individual-1 asked Individual-3 for his telephone number, which
Individual-3 refused to provide during the call.  After the
call, Individual-1 received an email from the Email Address with
a telephone number purporting to belong to Individual-3.

        j.   Later that day, Individual-1 called
CASPERSEN and confronted him with what he had learned about
Individual-3, as described supra in paragraphs 10(h) and (i).
CASPERSEN responded that he found the information "strange," and
that CASPERSEN would get to the bottom of it and call
Individual-1 back.

k.     Later that day, CASPERSEN called Individual-1 and said that Individual-1 was correct that the domain name of the Email Address had been recently registered. CASPERSEN stated that Individual-3 was formerly an outside administrator for Firm-1 in Guernsey. CASPERSEN further stated that an analyst at Firm-2 had provided CASPERSEN with contact information for Individual-3, and that things "don't look very good" for a colleague of CASPERSEN's.

l.     Later that day, CASPERSEN called Individual-1 and said that CASPERSEN had received advice from counsel, who did not want CASPERSEN to provide a lot of detail to Individual-1. CASPERSEN assured Individual-1 that the Foundation's $25 million investment was safe. Individual-1 replied that Individual-1 wanted to find out what happened, and that the Foundation wanted back the $25 million it had invested, plus interest. Individual-1 asked to speak to the general counsel of Firm-2.

m.     On or about March 8, 2016, after Individual-1 again asked to speak to the general counsel or another person at Firm-2, CASPERSEN instead referred Individual-1 to an employee at Firm-2 ("Individual-4") to discuss the Foundation's request for redemption of its investment. After speaking to Individual-4 by telephone, Individual-1 sent an email to CASPERSEN and Individual-4, requesting redemption of the November Note. Individual-4 responded to Individual-1's email, confirming that the request had been received.

n.     On or about March 11, 2016, CASPERSEN sent an email to Individual-1, representing that the redemption of the November Note was in process. CASPERSEN affirmed that Firm-3 would receive its funds by the end of the month, if not sooner.

o.     Individual-1 never invested in the March 2 Note for $20 million on behalf of the Foundation.

11.     Based on, among other things, my review of a consensually recorded telephone conversation between ANDREW

CASPERSEN, the defendant, and Individual-2, I know the following:

a.    On or about March 18, 2016, CASPERSEN represented to Individual-2 that "March 31st is still the outside date" for the return of the $25 million investment, and reassured Individual-2 that the collateral as described in the Promissory Note Compliance Letter was still in place.

12.    Based on, among other things, my review of bank records and state incorporation documents, I have learned the following:

a.    In or about July 2015, ANDREW CASPERSEN, the defendant, incorporated the SPV in the state of Delaware.

b.    In or about July 2015, CASPERSEN opened Account-1.  The mailing address for Account-1 is a residential address in New York associated with CASPERSEN.

c.    On or about November 5, 2015, the Foundation transferred approximately $25 million to Account-1 by bank wire for purposes of investment in the SPV pursuant to the November Note.  Of the $25 million investment, $400,000 consisted of Individual-1's personal funds, and $24.6 million consisted of funds belonging to the Foundation.  As of the Foundation's November 5, 2015 investment, Account-1 had only received a total of $2.51 million in incoming wire transfers since the SPV was incorporated, contrary to CASPERSEN's representations to Individual-1 that CASPERSEN had raised $30 million in investments in the Loan.

d.    On or about November 6, 2015, CASPERSEN sent a wire transfer from Account-1 in the amount of approximately $8,137,543 ("Wire-1") to an account controlled by Firm-2 ("Account-2"), to cover up an earlier unauthorized wire transfer of the same amount CASPERSEN had caused to be made to a bank account he controlled ("Account-3"), rather than to a Firm-2 bank account such as Account-2.

9

e.    Also on or about November 6, 2015, and
shortly thereafter, CASPERSEN sent wire transfers from Account-1
in a total amount of approximately $17,610,000 ("Wires-2") to
CASPERSEN's personal brokerage account ("Account-4") at a
financial services corporation (the "Brokerage"). Between on or
about November 6, 2015 and on or about December 4, 2015,
CASPERSEN used the proceeds of Wires-2 to execute securities
trades in Account-4.  More specifically, CASPERSEN traded
heavily in options based on the Standard & Poor's Depository
Receipts S&P 500 Exchange Traded Fund, which has the ticker
symbol "SPY." CASPERSEN's trades of SPY options with November
2015 expiration dates caused approximately $14.5 million in
losses in Account-4.

f.    On or about November 25, 2015, CASPERSEN
transferred approximately $770,000 from Account-4 to another
bank account CASPERSEN controlled ("Account-5").  On or about
November 30, 2015, CASPERSEN transferred approximately $762,267
from Account-5 to Account-2, to cover up another unauthorized
wire transfer of the same amount CASPERSEN had previously caused
to be made to Account-3, rather than a Firm-2 bank account such
as Account-2.

g.    On or about December 2, 2015, the Brokerage
sent CASPERSEN a letter stating that the Brokerage was going to
close Account-4 and informing CASPERSEN that he had until
December 4, 2015 to remove assets from Account-4.  On or about
December 4, 2015, CASPERSEN transferred approximately $9,450,000
from Account-4 into another account in CASPERSEN's name at a
different financial institution.

h.    As of December 31, 2015, Account-4 had a net
loss of approximately $25 million.

i.    On or about January 4, 2016, CASPERSEN sent
Firm-3 a wire transfer from Account-1, in the amount of
approximately $587,225 ("Wire-3"), with "Investment income
[Firm-4]" in the wire instructions.  Wire-3 did not consist of
interest generated by any financial transaction related to Firm-
1 or Firm-4.

j.   CASPERSEN did not keep the $25 million investment in the purported SPV, as he had represented to Individual-1 that he would.  On or about March 18, 2016, Account-1 contained less than $40,000 in funds, contrary to the promises in the November Security Agreement and the Promissory Note Compliance Letter.

13.   Based on, among other things, my conversations with attorneys representing Firm-1, attorneys representing Firm-2, and attorneys representing Firm-4, I know the following:

a.   Firm-1 has never employed any individual with Individual-3's name.

b.   Neither Firm-1, Firm-2, nor Firm-4 had any knowledge of, role in, or affiliation with the SVP that ANDREW CASPERSEN, the defendant, created.  Neither Firm-1 nor Firm-4 had authorized CASPERSEN to solicit funds on its behalf.  Firm-2 had not authorized CASPERSEN to make the Loan on its behalf.

### CASPERSEN's Scheme to Defraud Firm-5

14.   Based on, among other things, my review of email correspondence and conversations with attorneys representing Firm-5, I have learned the following:

a.   On or about October 24, 2015, ANDREW CASPERSEN, the defendant, sent an email to an employee of Firm-5 ("Individual-5"), in which CASPERSEN made the following representations: (i) CASPERSEN had "structured a new investment that may be of interest," namely a "security that offers private equity returns (15%) but without the risk or unpredictable cash flow"; (ii) the investment involved an "$80 million credit facility secured by private equity portfolio"; (iii) the investment offered interest at an annual rate of 15%, paid out quarterly; and (iv) the investment could be redeemed "at any time with 90 day notice." In additional conversations, CASPERSEN represented to Firm-5 that funds raised through this process would ultimately be used to purchase positions of investors in the Fund.

b.     On or about December 4, 2015, CASPERSEN sent an email to Individual-5, in which CASPERSEN represented that "[t]he cash from the borrowing will sit at the SPV (an LP in Fund III) to service the debt."  CASPERSEN also wrote: "Again, please make sure no one reaches out to [Firm-4] or any of their investors."  To the email, CASPERSEN attached a report for the Fund, dated September 30, 2015; financial statements for the Fund, dated September 30, 2015; and a draft promissory note for $25 million (the "December Note").  The December Note offered substantially the same terms as the November Note which CASPERSEN had sent to Individual-1.

c.     Between on or about December 4, 2015 and December 14, 2015, CASPERSEN exchanged emails with Firm-5 employees ("Firm-5 Employees"), in which CASPERSEN responded to questions asked by the Firm-5 Employees about the proposed investment.

d.     On or about December 11, 2015, Firm-5 Employees sent an email to CASPERSEN asking "is it possible to put our counsel in touch with borrower counsel?"

e.     On or about December 13, 2015, Firm-5 Employees sent an email to CASPERSEN, providing the name of Firm-5's outside counsel, and again asking to speak to CASPERSEN's counsel.

f.     On or about December 14, 2015, CASPERSEN sent an email to Firm-5 Employees saying "it looks like this is going to get pushed back to January."

g.     On or about December 29, 2015, CASPERSEN sent an email to Firm-5 Employees asking what else Firm-5 would need from CASPERSEN in order to carry out legal due diligence.

h.     On or about December 29, 2015 and December 31, 2015, Firm-5 Employees provided CASPERSEN with a list of questions that would be needed for legal due diligence.

i.     On or about March 7, 2016, CASPERSEN resumed communications with Firm-5 Employees.

j.     On or about March 8, 2016, CASPERSEN sent an email to Firm-5 Employees, attaching a promissory note for $50 million (the "March 8 Note"), which, aside from an increase in capital from $25 million to $50 million, contained substantially the same terms as the December Note.  CASPERSEN also sent a security agreement dated March 15, 2016 (the "March Security Agreement"), which contained substantially the same terms as the November Security Agreement.

k.     On or about March 9, 2016, CASPERSEN sent an email to Firm-5 Employees, representing that Firm-2 "arranged the entire facility and SPV and asked that I be one of the monitors along with [Individual-6] and [Individual-7]," who purportedly worked for Firm-1.

l.     On or about March 15, 2016, CASPERSEN sent an email to Firm-5 Employees, attaching a revised version of the March 8 Note, in which he specified that the SPV "shall maintain cash or cash equivalents in [Account-1] in an amount equal to or greater than the sum" of the aggregate principal and accrued but unpaid interest.

m.     Firm-5 never invested in the March 8 Note for $50 million.

15.    Based on, among other things, my conversations with attorneys representing Firm-1, attorneys representing Firm-2 and attorneys representing Firm-4, I know the following:

a.     Firm-1 has never employed or been represented by Individual-6 or Individual-7.

b.     Neither Firm-1, Firm-2 nor Firm-4 had any knowledge of, role in, or affiliation with the SVP that ANDREW CASPERSEN, the defendant, created, and neither Firm-1 nor Firm-4 had authorized CASPERSEN to solicit funds on its behalf. Neither Firm-1 nor Form-2 had agreed to participate in an offering of $80 million worth of promissory notes.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ANDREW CASPERSEN, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
KURT NAFER
CRIMINAL INVESTIGATOR
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK

Sworn to before me this
25th day of March, 2016

_____
HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK